**Ruben ESTES, Appellant,**

v.

**DICK SMITH FORD, INC., Appellee.**

**No. 86–2189.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1988.

Decided Sept. 9, 1988.

Brian J. Finucane, Kansas City, Mo., for appellant.

Mark G. Zellmer, St. Louis, Mo., for appellee.

Before McMILLIAN and ARNOLD, Circuit Judges, and HARPER,* Senior District Judge.

ARNOLD, Circuit Judge.

Ruben Estes brought this lawsuit against his former employer, Dick Smith Ford, claiming relief for race discrimination under 42 U.S.C. § 1981 and Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., and for fraud under Missouri common law. At trial, the District Court directed a verdict for Ford on Estes's fraud claim. The jury reached a verdict for Ford on Estes's § 1981 and ADEA claims, and the District Court subsequently entered judgment for Ford on Estes's claim under Title VII. On appeal, Estes argues that the District Court committed reversible error (1) by erroneously instructing the jury, (2) by excluding several categories of evidence tending to show racial discrimination at Dick Smith Ford, (3) by admitting an adverse EEOC determination on Estes's complaint, (4) by allowing Ford's lawyer to make improper characterizations of its pretrial responses to interrogatories, and (5) by erroneously directing a verdict for Ford on Estes's fraud claim. We find no error or abuse of discretion in the District Court's jury instructions, its management of Ford's closing argument, or its refusal to submit Estes's fraud claim to the jury. On the other hand, the District Court's exclusion of Estes's evidence showing a background of race and age bias was improper, as was its admission of the EEOC determination. Because these evidentiary rulings deprived Estes of a full opportunity to persuade the jury, we reverse and remand for a new trial on Estes's race and age claims.

* The Hon. Roy W. Harper, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

## I.

In February 1982, Ruben Estes was discharged from his job as a car washer/car porter for Dick Smith Ford, a Kansas City car dealership. Estes, a 52–year–old black man, had been working as a porter at Ford for over eleven years. Estes worked with three other car porters, two white and one black; Estes had more seniority and was considerably older than the other three porters.

In his service letter to Estes, Ford president Dick Smith wrote that Estes had been discharged due to a reduction in force, and that Ford "found his work to be most satisfactory." (Plaintiff's Ex. 15, Addendum 5.) After Estes filed a complaint with the EEOC, Ford presented the same explanation for the discharge to the EEOC investigator, who found no reasonable cause to believe that Ford had violated Title VII. At trial, Ford contended that Estes had been discharged for poor work performance, and that its earlier explanation had been falsified in order to help Estes find a new job and to preclude the possibility of a lawsuit by Estes.

Most of the remaining details of Estes's discharge are hotly disputed by the parties. The record reflects sharply conflicting accounts of, for example, whether Estes was as capable as his co-workers, and whether Estes's position was later filled by a white or black employee. A crucial dispute of fact involves the identity of the Ford manager who made the decision to discharge Estes. Ford alleges that this decision was reached exclusively by Ozell Kimble, a black manager who was Estes's brother-in-law and immediate supervisor. Estes claims that the decision was actually made by white managers higher up in Ford's organization, who were listed in Ford's response to one of Estes's interrogatories as persons who "either participated in, contributed to, approved, or were consulted in the decision" to fire Estes.

## II.

As a threshold matter, Ford argues that Estes's ADEA and § 1981 claims should never have even gone to a jury, on the ground that Estes failed to make out a prima facie case of age or race discrimination. We take this argument to mean, simply, that the District Court should have granted Ford's motion for a directed verdict on Estes's discrimination claims. We review the legal sufficiency of Estes's case under the familiar standard governing directed verdicts: specifically, we have to determine whether the record contains evidence from which a jury could reasonably infer that Estes was discharged because of his age or race. See *Dace v. ACF Industries,* 722 F.2d 374, 375–76 (8th Cir.1983), *modified per curiam,* 728 F.2d 976 (8th Cir.1984).

■ This inquiry is both more encompassing and less complicated than Ford implies. Ford's submissibility argument dwells on the sufficiency of Estes's prima facie case, as if this were a prior and distinct question from the sufficiency of Estes's case as a whole. In effect, Ford's position treats the prima facie showing in discrimination suits as a case-within-a-case, which a plaintiff must win conclusively before the factual dispute over the employer's motive can be considered. This is not the law. The three-step sequence of proof outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), does not create special rules of civil procedure for discrimination cases; "... it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Once the parties have developed the record on all stages of the *McDonnell Douglas* analysis, "whether the plaintiff really [made out a prima facie case] is no longer relevant." *U.S. Postal Service v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). What is relevant, at this point, is simply whether the plaintiff's evidence permits a reasonable inference of discrimination.

■ Ford's attack on the sufficiency of Estes's § 1981 claim exhibits this confusion

between the prima facie validity of a discrimination case and its submissibility. Ford argues that the two white car porters it retained were far more qualified for the job than Estes, and that Estes's relative lack of qualification prevents him from asserting discrimination as a prima facie matter. Estes counters with testimony that he could perform any job that the two white employees could perform. The fact that this dispute relates to an element of a prima facie case under *McDonnell Douglas* (namely, whether the plaintiff was qualified for his job) does not make it any less a matter for resolution by the jury. On this record, a jury could have concluded that Estes was fired because he was the least qualified porter. But it could also have concluded that he was qualified enough, and that Ford's decision to fire him was really based on his race. Accordingly, Estes's § 1981 claim was properly submitted to the jury.

█ In attacking the sufficiency of Estes's ADEA case, Ford relies heavily on our holding in *Holley v. Sanyo Manufacturing Inc.*, 771 F.2d 1161 (8th Cir.1985), that the termination of an older employee during a reduction in force, where a younger person assumes the older's duties, does not alone establish age discrimination. At the outset, we note that Ford's explanation at trial that Estes was discharged for poor work performance, rather than through a reduction in force, eliminates any relevance *Holley* has for Estes's burden of proof. If Estes can establish that this proffered explanation was unworthy of credence, then he will have made an indirect showing of discrimination which may persuade the finder of fact.[1] See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

█ Even if Estes was laid off through a reduction in force, as Ford originally told the EEOC, Estes's case clearly met the requirements for submissibility we outlined in *Holley*. In *Holley*, the plaintiff presented absolutely no evidence from which the jury could reasonably infer discriminatory animus. See *Holley*, 771 F.2d at 1166–68. Here, Estes provided evidence (some of which was improperly excluded, as we discuss below) that Ford had fired two other employees because of their age, and that not one of the 35 other porters who worked at Ford since 1970 was over the age of 42. The very fact that Ford had changed its original explanation for terminating Estes might persuade a reasonable jury to infer that Ford was not telling the truth. Therefore, the District Court correctly submitted Estes's ADEA claim to the jury.

### III.

As his first ground of appeal, Estes argues that the District Court's instructions to the jury misstated the legal threshold of proof we defined in *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) (en banc). In *Bibbs*, we held that an employer violates Title VII whenever an unlawful motive has played some part in an adverse employment decision, even when the employer was also motivated by lawful considerations which would have dictated the same decision. The Court instructed the jury that Estes's age must have been "a determining factor" in Ford's discharge decision, and that his race must have been "a motivating factor," for Estes to recover on his respective ADEA and § 1981 claims. Estes reasons that the force of the adjectives "determining" and "motivating" left the jury with the incorrect impression that race and/or age had to be the only factors in Ford's decision in order for Estes to prove liability.

█ We need not rule directly on the question whether the jury instructions mis-

---

1. We reject Ford's argument that a critical examination of its proffered reason somehow constitutes an improper judicial interference with its business decisions. Ford may lawfully fire any employee for sound or unsound economic reasons, so long as it does not fire any employee on account of age. The fact that an employer explains a termination in terms of business necessity does not, however, prevent a plaintiff from critically examining these proffered business reasons to test whether the employer is telling the truth.

stated the law under *Bibbs*.[2] This case must be tried again anyway because of errors in the admission and exclusion of evidence. At the new trial, the District Court should simply put the *Bibbs* issues directly to the jury. If race (or age) was a determining factor, the jury should say so, and not only liability but also (normally) the remedy of reinstatement would follow. If race was not a determining factor, but was a discernible or motivating one (a sort of lesser included offense in cases where the evidence allows an inference that mixed motives were involved), the jury should say so, with the result that defendant is liable to a declaratory judgment and attorneys' fees, and perhaps to prohibitive injunctive relief, but not to reinstatement, if the jury also finds that plaintiff would have been discharged anyway for nondiscriminatory reasons. Three questions should be put to the jury: (1) whether race or age was a determining factor; (2) whether (assuming a negative answer to question 1) race or age was a discernible or motivating factor, one among two or more that played a part; and (3) whether (assuming a positive answer to question 2) plaintiff would have been discharged anyway. It will be for the court to enter judgment as appropriate in accordance with the jury's answers.

Estes further appeals from the District Court's use of the word "discharge" rather than "decision to end plaintiff's employment" in its instructions to the jury. According to Estes, the distinction between the two phrases is crucial, because the major dispute between the parties was whether Estes was fired for cause (Ford's position) or discriminatorily selected for layoff (Estes's position). Estes argues that only the proffered phrase "decision to end plaintiff's employment" describes both possibilities, while "discharge" requires the jury to find that Ford did indeed fire Estes for cause. This is an unnecessarily subtle distinction. A jury which accepted Estes's position that Ford laid him off as a guise for his permanent termination would surely interpret the phrase "discharge" to describe this event. We find no unfairness in the Court's jury instruction.

### IV.

Estes's next ground of appeal is more substantial. The District Court excluded *in limine* a great deal of evidence which tended to show a climate of race and age bias at Dick Smith Ford. In particular, the Court prevented Estes from presenting the jury with evidence that Ford excluded blacks from its workforce, that Ford had fired two other employees specifically because of their ages, that Ford's service department offered free rides to white customers while black customers were told to rent cars, and that members of Ford's management referred to blacks as "niggers." Estes argues that these evidentiary exclusions significantly handicapped him in persuading the jury of the likelihood of discriminatory animus.

We agree. A trial court's exclusion of evidence under Fed.R.Evid. 403 is entitled to substantial deference on review, see *Warner v. Transamerica Ins.*, 739 F.2d 1347, 1350 (8th Cir.1984), but the Court's exercise of its discretion must not unfairly

---

2. Although *Bibbs* was a Title VII claim, its analysis of the burden of proof in mixed-motive cases extends to claims under the substantially similar provisions of the ADEA. See *Weber v. Block*, 784 F.2d 313, 316 n. 6 (8th Cir.1986).

Although § 1981 was enacted almost a century before Title VII, we conclude that the mixed-motive analysis in *Bibbs* applies to actions brought under § 1981. Unlike § 1983, which applies a "same-decision" test, see *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), § 1981 "prohibit[s] all racial discrimination, whether or not under color of law ..." *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 387, 102 S.Ct. 3141, 3148, 73 L.Ed.2d 835 (1982) (citation omitted). Unlike § 1983, the focus of § 1981 is properly on discriminatory motivation, rather than the actual impact of the practices which allegedly violate a plaintiff's rights, see *id.* at 390–01, 102 S.Ct. at 3149–56. We conclude that a discharge in which racial animus has played some motivating role falls within the proscription of § 1981. See *Edwards v. Jewish Hospital of St. Louis*, 855 F.2d 1345 (8th Cir.1988). *Hervey v. City of Little Rock*, 787 F.2d 1223 (8th Cir.1986), cited by Ford, is not to the contrary. That case involved a constitutional claim brought under § 1983, and thus was governed by the *Mt. Healthy* line of authority.

prevent a party from proving his case. In this case, we examine the consequences of the trial court's exclusions with particular care, since the court's determinations of probative value and prejudice were made before trial began, rather than during the development of the plaintiff's case before the jury. See *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir.1987).

The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives. Judge Posner has explained:

> [d]efendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it.... The law tries to protect average and even below-average workers against being treated more harshly than would be the case if they were a different race, sex, religion, or national origin, but it has difficulty achieving this goal because it is so easy to concoct a plausible reason for ... firing ... a worker who is not superlative. A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.

*Riordan, supra*, 831 F.2d at 697–98. Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices —evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.

▮ In this case, the District Court excluded background evidence concerning Ford's workforce on the ground that it was not material, since Estes presented an individual disparate treatment case, and not a disparate impact case. *Estes v. Dick Smith Ford*, No. 83–1380–CV–W–5, slip op. at 3 (W.D.Mo., Aug. 27, 1986). It is true that Estes ultimately had to prove that his particular termination was unlawful. It is a very different thing to say that a background of discrimination is not relevant to proving a particular instance. In this case, the jury might have evaluated Estes's discrimination claim differently if he had been allowed to present evidence that Ford had not hired a single black person among the 153 employees hired from 1978 to 1983, and that only four of the 214 people employed at Ford during this period were black. It is true, as Ford argues, that these numbers reflect the totality of Ford's hiring and promotion policies, and do not specifically isolate, for example, whether the few blacks who worked at Ford were more likely to be fired. As a matter of common sense, however, it is hard to see how evidence which suggests that Ford discriminated against blacks in hiring would be irrelevant to the question of whether it fired a black employee because of his race. If a plaintiff can present comparative statistical data which "might suggest that equal employment opportunity was not the [employer's] prevailing policy ...," this evidence has some probative value for the question of whether discrimination has motivated a particular employee's treatment. *Naraine v. Western Electric Co.*, 507 F.2d 590, 594 (8th Cir.1974).

▮ There remain unresolved disputes over the significance of Estes's workforce statistics. Ford argues that the virtually all-white composition of its workforce is explained by the fact that the surrounding residential area is only .8% black, and that lack of black applicants may explain the lack of black employees. Estes counters that the relevant area of employment is larger than Ford defines it, and when properly defined is 25% black. Neither party presents evidence of the number of black applicants for jobs at Ford. If the District Court had reached a specific, reviewable conclusion that Ford hired blacks in the same proportion as whites, we would be less likely to disturb its decision to exclude the workforce evidence. On this record, however, we have no reason to assume that

Estes's explanation of the data is less plausible than Ford's. The jury should have been allowed to consider Estes's workforce evidence and sort out the parties' conflicting explanations of its significance.[3]

■ The District Court also excluded evidence of prior acts of discrimination against black customers who Estes claims were denied rides home in the Service Department's courtesy car that were routinely offered to white customers. Ford defends the exclusions, first, on the ground that Estes's proffered evidence does not show a sufficient number of prior instances of discrimination to prove that Ford's usual business practice was to discriminate. Ford confuses the sufficiency of evidence to establish a violation with its admissibility. Evidence of prior acts of discrimination is relevant to an employer's motive in discharging a plaintiff, even where this evidence is not extensive enough to establish discriminatory animus by itself. See *Hogan v. American Telephone & Telegraph Co.*, 812 F.2d 409, 410–11 (8th Cir.1987). Ford argues further that the treatment of black customers is sufficiently distinguishable from the treatment of black employees that evidence of Ford's discrimination against customers may not be probative. This argument might have merit if the Ford employees allegedly responsible for the discrimination against customers were unconnected with the employees who allegedly fired Estes. See *Hunter v. Allis–Chalmers Corp., Engine Division*, 797 F.2d 1417, 1424 (7th Cir.1986). Here, however, Estes alleged that the discrimination against black customers occurred in his own Service Department, and Estes alleged that the manager of the Service Department who authorized this practice also played a role in the decision to fire Estes. Although the jury need not have accepted

Estes's version of the story, he should have been allowed to present this evidence at trial. It defies common sense to say, as Ford implies, that evidence of an employer's discriminatory treatment of black customers might not have some bearing on the question of the same employer's motive in discharging a black employee.

■ Finally, the District Court excluded evidence that a Ford manager, who Estes alleged participated in the decision to fire him, told racist jokes about blacks at staff meetings and referred to black customers and Estes himself as "damn niggers." Ford's defense of the exclusion is that isolated racial comments do not themselves constitute a violation of Title VII, citing our opinion in *Johnson v. Bunny Bread*, 646 F.2d 1250, 1257 (8th Cir.1981). Ford's argument misses the point. Estes is not claiming relief for having been insulted. Estes is trying to prove by a preponderance of evidence that his supervisors discharged him because he is black, and testimony that these same supervisors on occasion used racial insults against him and other black people is certainly probative of this claim.

■ Ford raises a final, general defense of the District Court's exclusions— that Estes failed to inform the court of the substance of the evidence offered as required by Fed.R.Evid. 103(a)(2). In particular, Ford suggests that Estes did not establish, for example, the number of times black customers were denied courtesy rides, or prove that non-discriminatory reasons might not have motivated the discharges of other Ford employees. Ford's approach to Rule 103(a)(2) is far too demanding. A party offering proof which is excluded at trial preserves the record on appeal by telling the court what the evidence will tend to prove, and Estes told the

---

**3.** Ford makes the related argument that the sample size of 214 employees is too small to derive reliable conclusions about Ford's practices from the composition of the work force. This argument apparently assumes that Ford's definition of a .8% black employment area is the appropriate one, since the employment of only four blacks out of 214 workers under Estes's definition of a 25% black applicant pool would certainly present a statistically significant

conclusion. Even if the evidence did not yield a racial disparity of more than two or three standard deviations, see *Castaneda v. Partida*, 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977), it would still be probative for the fact-finder in conjunction with all other relevant evidence. See *Craik v. Minnesota State University Board*, 731 F.2d 465, 475–76 n. 13 (8th Cir.1984).

District Court enough for us to tell what was being excluded. Rule 103(a)(2) does not require the party to answer every possible objection to the significance of the evidence: these problems affect the weight of the evidence proffered, and not its admissibility.

▮ Rule 103 does preclude a finding of reversible error unless the trial court's evidentiary rulings have affected Estes's substantial rights. Taken in isolation, any one of the exclusions Estes appeals from might not have been prejudicial enough to justify reversing the judgment. See *Hogan*, 812 F.2d at 411. Taken cumulatively, however, the exclusions did make a significant difference to Estes's chances of persuading the jury. In effect, the District Court limited Estes to proving Ford's discriminatory intent solely from the facts of his own discharge. Here, as in most discrimination cases, the facts of the discharge were inconclusive. Ford's explanation that Estes was discharged for poor performance was facially plausible and difficult to refute. Although Estes could respond that Ford had changed its initial explanation, and Estes had been an adequate employee, these facts did not, without some other evidence of discriminatory animus, present a tangible reason for disbelieving Ford's account of its motives.

Estes's offer of proof concerning Ford's workplace and prior discriminatory acts could have provided this other evidence. We do not know whether Estes's proffered evidence is invulnerable to attack at trial, or whether a jury would necessarily be persuaded by it in any case. The District Court's decision to exclude did deprive Estes of a fair opportunity to prove his case, however, and Estes's chances of prevailing with his full case before a jury are substantial enough to justify remanding for a new trial.[4]

## V.

▮ Estes also appeals from the District Court's admission of an EEOC finding that there was no reasonable cause to believe that Estes had been discriminated against. The District Court had initially ruled *in limine* that the EEOC letter was not admissible, but changed its ruling on the ground that "enough trial time was devoted to the EEOC investigation, that the Court felt the jury was entitled to know the results." *Estes, supra,* slip op. at 2.

On review, we leave questions concerning the admission or exclusion of EEOC determinations to the sound discretion of the trial court. See *Johnson v. Yellow Freight System*, 734 F.2d 1304, 1308–10 (8th Cir.), *cert. denied*, 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984). The court must exercise its discretion, however, to ensure that unfair prejudice does not result from a conclusion based on a cursory EEOC review of the very facts examined in depth at trial. In this case, the EEOC determination exhibits the same danger signs that we held justified exclusion in *Yellow Freight*. Here, Estes's adverse EEOC determination letter consisted only of two conclusory sentences, precisely like the letter excluded in *Yellow Freight*. As we said in that case,

> ... there is little probative value in the EEOC's conclusory statements regarding the same evidence [presented to the jury]. To admit the report under these circumstances would amount to admitting the opinion of an expert witness as to what conclusions the jury should draw, even though the jury had the opportunity and the ability to draw its own conclusions from the evidence....

*Id.* at 1309. More importantly, the EEOC based its determination of no reasonable cause on Ford's earlier explanation that

---

4. Estes further appeals the District Court's decision to allow Ford to reopen its case. Ford's witnesses testified that a single EEOC poster concerning race discrimination had been posted at work. After the close of Ford's case, Estes argued that at the applicable time, the government had published its ADEA notice-of-rights poster separately, so that, on its own evidence,

Ford had failed to post the required age notice. The District Court allowed Ford to reopen its case, so that its witness could testify that the relevant age poster had also been posted. Estes's counsel was not surprised by Ford's reopening, and was allowed to attempt impeachment of Ford's witness. We find no abuse of discretion in this ruling.

Estes had been laid off due to a reduction in force. Any evidentiary value the EEOC letter might have had is severely undermined where the EEOC made findings based on accounts of a termination different from the ones presented at trial. Nor is it clear that Estes's numerous references at trial to Ford's statements before the EEOC justified the introduction of the determination letter. We find no indication that either party had insinuated to the jury that it had prevailed before the EEOC. For Estes, in particular, reference to the EEOC proceedings was critical to showing that Ford's explanation for the discharge had changed. In these circumstances, the EEOC letter should have been excluded.

## VI.

 Estes argues, next, that the District Court abused its discretion by overruling his objection to Ford's closing argument. Ford had listed four white managers as persons who "either participated in, contributed to, approved or were consulted in the decision regarding Estes" in its pretrial response to an Estes interrogatory, an admission which Estes claims contradicted Ford's explanation at trial that Estes had been fired solely by his black supervisor. During closing argument, Ford's lawyer told the jury that:

> You can't call people if you don't list them in interrogatories, you can't list them as witnesses so you've got to list everybody you can.

Transcript 3–129. Estes objects that Ford's lawyer left the jury with the misleading impression that trial rules somehow required the managers to be listed, whether or not they were privy to the decision to fire Estes; Ford responds that its closing argument merely stressed its position that the four managers had only been consulted in the decision, and that their names had been included so that the managers could testify about their knowledge of the circumstances of Estes's discharge without fear of impeachment based on Ford's omission of their names during discovery. The trial court has the responsibility to ensure that counsel's closing argument does not misrepresent either the law or the evidence, see *Higgins v. Hicks Co.*, 756 F.2d 681 (8th Cir.1985), but the question of whether Ford's remarks actually left a misleading impression depends on the context and tone of the argument at trial. The District Court was in a better position than we are to judge whether the jury was misled, and we have no reason to disturb its discretionary judgment that no prejudice occurred.

## VII.

 Finally, Estes appeals from the District Court's directed verdict for Ford on Estes's fraudulent-misrepresentation claim. The theory of Estes's fraud claim had been that Ford had falsely told Estes that his discharge was a temporary lay-off, rather than a permanent termination. Estes argues that he had relied on this false statement to his detriment by refraining from seeking other employment. Although Estes argues that Ford's initial characterization of Estes's discharge as a lay-off gave him false hope, he does not allege that Ford ever directly promised him that he would be reinstated. We agree with the District Court that Ford's equivocation on the nature of Estes's discharge does not constitute a sufficiently definite promise of re-employment for Estes to recover on under Missouri law. *Cf. Wilson v. Westinghouse Electric Corp.*, 838 F.2d 286, 291 (8th Cir.1988).

\* \* \* \* \* \*

We affirm the District Court's directed verdict for Ford on Estes's fraud claim, but we reverse and remand for a new trial on Estes's Title VII, § 1981, and ADEA claims.

It is so ordered.