IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


HARTLEY V. METROPOLITAN UTILITIES DIST.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


KRISTINA J. HARTLEY, APPELLANT,

V.

METROPOLITAN UTILITIES DISTRICT OF OMAHA, APPELLEE.


Filed March 3, 2015.    No. A-14-050.


Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Reversed and remanded for a new trial.

Abby Osborn and Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Mark Mendenhall and A. Justin Cooper, of Metropolitan Utilities District of Omaha, for appellee.


MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

Kristina J. Hartley filed a gender discrimination action against Metropolitan Utilities District of Omaha (MUD) in the district court for Douglas County, alleging she was denied a supervisory promotion based on her gender, and that a male without the requisite qualifications received the position. Prior to trial, and throughout trial, the court made evidentiary rulings excluding certain testimony and evidence from the two other female applicants for the position, pursuant to a motion in limine filed by MUD. Following a jury trial, the jury found in favor of MUD. Hartley appeals the verdict, arguing that the district court improperly excluded evidence from the two other female applicants for the position. We agree with Hartley that the court's exclusion of the other female applicants' testimony unfairly deprived Hartley of a full and fair opportunity to present her case, and we therefore reverse and remand for a new trial.

BACKGROUND

Hartley began working for MUD in 1984 in customer service, after receiving a bachelor's degree in interior design. Over the next several years, Hartley proceeded to advance in the company; she was promoted to drafting technician IV in 1986, drafting technician III in 1988, drafting technician I in 1989, and senior drafting technician in 1991. In 1994, Hartley was promoted to senior engineering technician in plant engineering. In that position, Hartley acted as an inspector of the installation of water mains installed by outside contractors, which required her to be out in the field on a daily basis. Hartley's position also required her to do "utility locating," which entailed marking the ground where gas or water mains were located, so that contractors digging in the ground did not "hit" the mains.

Between 2003 and 2009, Stephanie Henn, as senior plant engineer, was Hartley's direct supervisor. Henn was promoted to director of plant engineering in February 2009, at which time John Velehradsky became Hartley's direct supervisor.

In 2009, Hartley learned that the position of supervisor of field engineering would be opening due to the pending retirement of the individual who had held the position since 2003. The position would have promoted Hartley from the top of the M-3 pay grade to an M-5 pay grade. This position required direct supervision of 17 individuals, including 10 utility locators (who are responsible for locating MUD facilities), and 7 field engineers (inspectors who work with construction crews to install gas and water mains). Henn, as director of plant engineering, was the direct supervisor of the position. According to Hartley, when she spoke to Henn to express her interest in the position and ask about the job requirements (prior to the official job opening announcement), Henn tried to "sway" Hartley into applying for a different position.

On January 20, 2010, MUD set forth the minimum requirements for the supervisor of field engineering position. Included among the minimum requirements were "two years of college in an area related to Engineering," but a 4-year engineering degree or engineering technology degree was preferred. The candidate was also required to have utility locating experience in the last 5 years, with utility locator operator qualification preferred. Previously, the position did not require utility locating experience. According to Henn, the individual retiring from the position was unable to utility locate, but she felt it should be a requirement of the position and contacted Human Resources to change the job description to add that requirement. The requirements also stated that the candidate: "Must have the ability to effectively interact and communicate with employees, District Supervisory and Professional personnel, and personnel from outside organizations." The informal notice of the position was posted on January 27, and employees interested in the position were required to apply by February 9.

There were 11 applicants for the position, 8 men, and 3 women (Hartley, Sherri Meisinger, and Shala Chevalier). On February 8, 2010, 3 days before Hartley's interview with Henn, Velehradsky gave Hartley a written performance appraisal, although Hartley had not received a performance appraisal in 7 years. Velehradsky's appraisal of Hartley indicated she met or exceeded standards in all of her key job functions; however he checked the box indicating that Hartley did not "show potential for additional responsibilities through self-motivation, initiative and satisfactory performance of current job duties[.]" His comment explained that although he believed Hartley would "perform well immediately in a non-supervisory

promotional capacity," he felt she "need[ed] to work on improving her listening and communication skills before she would be ready to supervise others at the level of her current position." None of Hartley's appraisals, either prior to or after Velehradsky's appraisal, contained comment on Hartley's inability to communicate. Hartley also testified she "was never pulled aside in the office to say that [she] needed to improve on something or that [she] was doing something wrong."

The day after receiving the appraisal, Hartley met with Velehradsky and Henn to discuss the appraisal. Hartley believed that the appraisal was a way for Henn to eliminate Hartley from receiving the position because Henn did not like working with women. According to Hartley, Henn treated Hartley as a secretary, and not as equal to the men in the field, even though Hartley had helped train most of the men, including the male candidate Henn ultimately selected for the position, Dave Stroebele. Following the meeting, Velehradsky did make some changes to Hartley's performance appraisal, and after a second meeting with Hartley regarding his second draft, made a third draft of the appraisal. However, Velehradsky's comments and recommendations about Hartley's communication skills did not change. Hartley ultimately signed the third draft of Velehradsky's appraisal on February 17, 2010. Hartley handwrote comments on the appraisal expressing (in part) that it was "quite ironic" that she would receive a performance appraisal just days before she interviewed for the supervisory position.

During the time that Henn was Hartley's supervisor, she did not perform any annual performance appraisals of Hartley, although MUD had a policy that provided an employee should have an annual performance appraisal on the date of the employee's anniversary of starting a job. Hartley's last appraisal was in April 2003, prior to Henn becoming Hartley's supervisor. Henn also had not conducted a performance appraisal of Hartley's coworker, Jim Stary, and his last appraisal was in March 2003. Henn did, however, conduct performance appraisals of Hartley's other coworkers, Robert Wozny (June 2008), Stroebele (May 2006), and James Wemhoff (April 2007). Henn also conducted a performance appraisal of Stroebele in November 2009, although she was no longer his supervisor. Henn explained that she performed Stroebele's evaluation herself because Velehradsky had never done one before, so he "shadowed" her.

Velehradsky testified he began working on Hartley's appraisal in January 2010, and gave it to her in February 2010. Velehradsky testified he had no "official awareness" that Hartley had applied for the promotion, although he knew she was part of the potential group of candidates that could apply. Velehradsky testified that he had a directive from upper management that he had to finish performance appraisals which would be used for evaluation of employees' cost-of-living increases "the following June." According to a memorandum from MUD human resources dated April 20, 2009, an audit of employee files revealed there were a number of employees who had not received regular performance appraisals. The memorandum indicated that there had been a number of job selection grievances in the past few months and the lack of regular performance appraisals "makes it very difficult for us to defend a supervisor's selection without written documentation of that employee's performance[.]"

Henn conducted interviews of the candidates for the supervisor of field engineering position between February 10 and 17, 2010. Henn interviewed Hartley for the position on February 11. Hartley described the interview as "rushed" and "very hurried."

On March 24, 2010, Henn made her recommendation to the board that Stroebele be promoted to the position of supervisor of field engineering. Stroebele was tenth in seniority out of the 11 applicants. He did not have a 2-year degree at the time; however, Henn testified that she viewed Stroebele's transcripts as the equivalent of 2 years of college with some engineering-related courses, in satisfaction of the minimum requirements of the position.

In Henn's recommendation letter, she described the various reasons why she selected Stroebele, and why she did not select the other 10 candidates. With respect to Hartley, Henn stated that when Hartley received feedback that was negative, "she gets very upset, blows the situation out of proportion, and involves as many coworkers as possible, whether they were involved in the situation or not," which Henn stated "[did] not demonstrate good judgment or professionalism[.]" (At trial, Henn described Chevalier similarly, testifying that "if [Chevalier] got bad news, she would involve lots of other people in the office and kind of make a big deal about it," which Henn did not think showed leadership or professionalism.)

Henn's letter continued, "by [Hartley's] own admission" she struggled with utility locating, "often needing assistance." Henn's letter also stated that "Hartley talks much more than she listens" and "is quick to jump to a conclusion prior to evaluating the entire situation," and that Hartley "has not demonstrated good listening skills with her coworkers." Henn also stated Hartley's attendance record was lacking compared to Stroebele's.

Henn's letter stated that Stroebele had taken on larger, more difficult projects than Hartley and handled them very efficiently, and Hartley "require[d] a lot more help from her supervisor if she encounter[ed] anything out of the basic realm of her current position[.]" Henn stated that "Mr. Stroebele has been locating utilities skillfully for nearly a decade, making him the superior candidate." Henn described Stroebele as calm, cool, even-keeled, very down-to-earth, and humble. Henn stated that Stroebele exhibited strong leadership skills through his current work directing contractors, his previous experience supervising construction crews (prior to his employment with MUD), and his experience as a training officer in the Navy reserves.

The board approved Stroebele's promotion in May 2010.

Hartley filed a complaint with the "NEOC" and "EEOC" on July 12, 2010, and was given 90 days to file suit on June 2, 2011. Hartley filed a complaint and request for jury trial in district court on August 31, seeking damages under the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1104 et seq. (Reissue 2010). Hartley alleged that she was denied a supervisory position based on her gender, and that a male without the requisite qualifications received the position. (Hartley generally argued that Stroebele did not meet the 2-year education in the field of engineering minimum requirement).

MUD filed an answer on October 11, 2011, denying the substantive allegations in Hartley's complaint. MUD filed a motion for summary judgment on August 12, 2013, which the court overruled on September 4, finding that a genuine issue of material fact existed with respect to MUD's claim for a legitimate nondiscriminatory reason for failing to promote Hartley.

On October 21, 2013, MUD filed a motion in limine, seeking an order "precluding [Hartley] from mentioning, presenting arguments concerning, or introducing evidence" from Hartley, Meisinger, or Chevalier, as it related to allegations of discrimination against Meisinger and Chevalier in their rejection of the same position at issue. MUD's motion did not state the

grounds on which it sought to exclude such evidence. No written order on MUD's motion in limine appears in our record, but on the record on November 18, (prior to commencement of trial), the court stated:

> With regard to the motion in limine, we have also previously covered that as well with regard to the two anticipated witnesses, coworkers of Ms. Hartley, and the Court, I think, was clear in the fact that their testimony obviously would--the Court would presume would be going towards observations or whatever evidence they have with regard to Kristina Hartley, and that their testimony, obviously, would not be going towards any respective claims that they may have on behalf of themselves or other women.

A jury trial was held November 18 to 20, 2013. The jury heard testimony from Hartley, Henn, and Velehradsky, as well as some of Hartley's coworkers, including Perry Lightfoot, Stary, and Stroebele.

Henn testified she did not promote Hartley primarily because of her communication issues. Henn recalled an incident in 2008 (when Henn was still Hartley's direct supervisor) when Henn had to leave unexpectedly for the day, and did not inform Hartley, who apparently had needed to get ahold of Henn in her absence. The next morning, Hartley came to Henn and was "very upset" that she could not reach Henn, which Henn thought was "unreasonable." Henn thought it was "a communication and a leadership issue if you're going to get very upset with your boss after, what seems to me, not a very big issue." Velehradsky also recalled this incident, and thought it was an "unprofessional encounter."

Henn testified Hartley would "dominate" weekly staff meetings and "a lot of the times the other folks wouldn't get to express their opinions. She wanted to finish other people's sentences." Henn testified she wanted somebody who was going to listen and let other people answer. Henn testified Hartley would call her "way more than any of her other team members combined." Henn felt like Hartley often wanted Henn's help making a decision, and Henn wanted a supervisor who could make decisions on his or her own.

Velehradsky testified that his main concern with Hartley's potential for advancement was also due to her communication issues. Velehradsky testified that in the 9 months that he directly supervised Hartley, he was of the opinion that she could be "difficult at times to deal with." Velehradsky testified that Hartley visited Henn's desk to resolve problems more frequently than the other senior engineering technicians. Velehradsky testified that he did not feel Hartley did a very good job listening to others, and that she would call him multiple times a day for things that other technicians were able to take care of on their own. Velehradsky also testified that utility locating was not one of Hartley's "favorite" things to do and she would ask for assistance.

The testimony from Hartley and people that Hartley had worked with in her time at MUD, including Lightfoot, Stary, Meisinger, Chevalier, and Stroebele, generally contradicted Henn and Velehradsky's testimony regarding Hartley's communication issues, testifying that Hartley did not dominate conversation during their weekly staff meetings and they did not observe that Hartley had difficulties communicating with other people. Hartley's performance appraisal also noted she had not had a chargeable locating hit since 2005, whereas Stroebele's appraisal noted he has had 2 chargeable locating hits in the last 3½ years.

The jury also heard some testimony from the two other female employees who had applied for and been rejected from the position, Meisinger and Chevalier. However, throughout the first day of trial, the court sustained various objections by MUD regarding testimony that Hartley attempted to offer with respect to Meisinger and Chevalier's application and rejection from the position at issue, pursuant to MUD's motion in limine. We will discuss in detail the court's evidentiary rulings further below where relevant to our analysis.

At the time of trial, Hartley had made a lateral move within MUD to a senior engineering technician position in the relocations department or the "design side." The court sustained MUD's relevancy objection to exhibit 49, which was Hartley's letter dated June 13, 2011, applying for the lateral position (more than a year after the hiring decision at issue in the instant case). The court also sustained an objection to exhibit 84 on the grounds of relevance, foundation, and outside of proper rebuttal. Exhibit 84 was an undated document from personnel made after Hartley's lateral transfer was accepted. The document, signed by an MUD supervisor named "Jeff Loll," stated that Hartley "communicates well with contractors," she is "direct and professional," and she "functions independently without excessive reliance on others."

At the close of all the evidence, Hartley moved for a directed verdict, which the court overruled. On November 20, 2013, the jury entered a verdict in favor of MUD. The court entered an order on the verdict on November 21.

On December 2, 2013, Hartley filed a motion for new trial, claiming that there was irregularity in the proceedings, the verdict was not sustained by sufficient evidence or was contrary to law, and there was error of law occurring at the trial. A hearing was held on Hartley's motion on December 10. Hartley argued that she was prejudiced by not being allowed to present evidence with respect to the discriminatory atmosphere surrounding the promotion decision, and that MUD took actions in an effort to discriminate against Hartley, Meisinger, and Chevalier. Hartley also argued that MUD did not articulate a legitimate nondiscriminatory reason for the action they took, and if they did so, the greater weight of the evidence was that it was not the true reason for not promoting Hartley. Hartley further argued that exhibit 84 rebutted all of Henn's stated reasons for not promoting Hartley.

On December 18, 2013, the court entered an order overruling Hartley's motion for new trial.

Hartley timely filed this appeal.

ASSIGNMENTS OF ERROR

Hartley assigns that the trial court erred: (1) in granting MUD's motion in limine excluding the testimony and evidence of two other women regarding their allegations of gender discrimination against MUD in pending cases; (2) in failing to receive into evidence Exhibits 49 and 84, which she claims contradicted the testimony of MUD regarding the reasons it did not select her for the position; (3) in upholding the jury verdict as no reasonable jury could conclude Hartley was not discriminated against; (4) in overruling her motion for new trial; and (5) in overruling her motion for directed verdict.

STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Simon v. Drake*, 285 Neb. 784, 829 N.W.2d 686 (2013). In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Id*.

ANALYSIS

*Exclusion of Meisinger and Chevalier's Testimony Pursuant to MUD's Motion in Limine.*

We begin with Hartley's first assigned error, as it is dispositive of this appeal. Hartley argues that the trial court erred in sustaining MUD's motion in limine, excluding certain testimony from Chevalier and Meisinger regarding their claims for gender discrimination arising out of their rejection from the same promotional decision at issue. We agree that such exclusion unfairly prejudiced Hartley's right to a full and fair opportunity to present her case, particularly where the trial court did not state or explain the grounds for excluding such evidence.

Hartley's complaint raised a claim of gender discrimination based upon disparate treatment, that is, that as a female she was treated differently than a similarly situated male was or would have been under the circumstances. Our Supreme Court has adopted a three-part test, commonly referred to as the "*McDonnell Douglas* test," for purposes of construing the NFEPA in disparate treatment cases. See *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). See also, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The three-part test has been set forth as follows:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." . . . Third, should the defendant carry the burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Harris v. Misty Lounge, Inc.*, 220 Neb. 678, 682, 371 N.W.2d 688, 691 (1985) (citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 668 (1973).

MUD does not dispute that Hartley initially established a prima facie case of gender discrimination under a theory of disparate treatment; Hartley established (1) that she, as a female, was a member of a protected class within the meaning of the NFEPA; (2) that she met the qualifications for the position of employment sought; (3) that she applied for and was rejected from that position; and (4) that after she was rejected, a male was selected to fill the position. See *IBP, Inc. v. Sands*, 252 Neb. 573, 563 N.W.2d 353 (1997).

Upon establishing her prima facie case, the burden then shifted to MUD to articulate a legitimate, nondiscriminatory reason for rejecting Hartley. This required MUD to clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed

by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. See *Father Flanagan's Boys' Home v. Agnew, supra*. Hartley then had the burden to demonstrate that MUD's proffered reason was pretext. See *Harris v. Misty Lounge, supra*. Although the *McDonnell Douglas* presumption shifted the burden of production to MUD, the ultimate burden of persuading the trier of fact that MUD intentionally discriminated against her remained at all times with Hartley. See *Father Flanagan's Boys' Home*, *supra.*

As we are reversing and remanding for new trial, we will not revisit the evidence in detail that MUD supplied in support of its articulated legitimate, nondiscriminatory reasons for rejecting Hartley. Suffice it to say, Henn and Velehradsky testified that Hartley had communication and utility locating issues, both of which Henn felt were necessary for the supervisory position. According to the *McDonnell Douglas* framework, once MUD proffered a legitimate, nondiscriminatory reason for failing to promote Hartley, Hartley had the burden to demonstrate that MUD's proffered reason was pretext for discrimination. See *Harris v. Misty Lounge*, *supra*. However, the trial court's blanket exclusion of evidence pursuant to MUD's motion in limine prevented Hartley from having a fair opportunity to satisfy her burden to show that the legitimate reasons offered by MUD were not its true reasons for not promoting Hartley, but were instead a pretext for discrimination.

As our antidiscrimination acts are patterned after federal law, we look to federal decisions for guidance. See *Ventura v. State Equal Opportunity Comm'n*, 246 Neb. 116, 517 N.W.2d 368 (1994). Once an employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105, 105 (2000). The plaintiff may demonstrate pretext by showing that the employer's explanation is unworthy of credence, *Reeves, supra*, or "by persuading the court that a [prohibited] reason more likely motivated the employer." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011).

There is no restriction on the type of evidence a plaintiff may produce to demonstrate that an illegitimate criterion was a motivating factor in the challenged employment decision. *Richardson v. Sugg*, 448 F.3d 1046, 1058 (8th Cir. 2006). The plaintiff need only present evidence, be it direct or circumstantial, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision. *Id*. Because an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination, this evidence should normally be freely admitted at trial. *Hawkins v. Hennepin Technical Ctr.*, 900 F.2d 153 (8th Cir. 1990).

The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives. *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir. 1988) *overruled on other grounds* by *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). In *Estes*, *supra*, the Eighth Circuit reversed and remanded a suit by an employee alleging age and race discrimination because the district court excluded in limine evidence which tended to show a climate of race and age bias at the

defendant company. The Eighth Circuit concluded that although a trial court has discretion to exclude evidence, the court's discretion must not unfairly prevent a party from proving its case, and that an employer's background of discrimination is relevant to proving a particular instance of discrimination. In *Hawkins*, *supra*, a female employee bringing gender discrimination and unlawful retaliation claims following her sexual harassment complaints was prohibited in limine from introducing any evidence of alleged acts of sexual harassment committed against herself or others, as well as making any reference to previous litigation between former students and the defendant over alleged acts of sexual harassment beyond the bare fact that a complaint had been made. The trial court reasoned that such evidence was not relevant and was unduly prejudicial. Citing to *Estes*, *supra*, the Eighth Circuit in *Hawkins* reversed, concluding that such evidence was plainly relevant, and the trial court's blanket exclusion unfairly prevented the plaintiff from fully presenting her claim. The Eighth Circuit stated that unflattering testimony about the employer's history and work practices "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive" and that an employer's past discriminatory policy and practice "may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination." *Id.* at 155-56. The Eleventh Circuit has also upheld the admission of coworker testimony in employment discrimination cases to prove the intent of an employer to discriminate. For example, in *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008), a racial discrimination case, the plaintiff and two other coworkers were discriminated against by the same supervisor; the Eleventh Circuit concluded that the experiences of the two coworkers were "probative of [the supervisor's] intent to discriminate." *Id.* at 1286.

To show that MUD's explanation was pretext for discrimination based on gender, Hartley attempted to elicit testimony from the only two other women to apply for the position at issue, Chevalier and Meisinger (both long-term employees at MUD), which the court denied. Prior to trial, MUD's motion in limine sought an order from the court "precluding Hartley from mentioning, presenting arguments concerning, or introducing evidence of" (1) testimony from Hartley related to allegations of discrimination against either Meisinger or Chevalier; (2) testimony from Meisinger related to alleged discrimination in her rejection from the position at issue; (3) testimony from Chevalier related to alleged discrimination in her rejection from the position at issue; and (4) "[a]ny documents, prior sworn testimony, statements, or other evidence that relate[d] to, pertain[ed] to, ar[ose] from, or incorporate[d] allegations of discrimination related to [Chevalier and Meisinger's separate lawsuits]." MUD did not specify in its motion whether it sought to exclude the evidence because it was irrelevant or because the probative value was substantially outweighed by unfair prejudice pursuant to Neb. Rev. Stat. § 27-403 (Reissue 2008). The trial court made the following ruling prior to trial on the record:

> With regard to the motion in limine, we have also previously covered that as well with regard to the two anticipated witnesses, coworkers of Ms. Hartley, and the Court, I think, was clear in the fact that their testimony obviously would--*the Court would presume would be going towards observations or whatever evidence they have with regard to Kristina Hartley, and that their testimony, obviously, would not be going*

*towards any respective claims that they may have on behalf of themselves or other women.* That this is about Kristina Hartley, and that that's the reason I'm here. . . .

(Emphasis added.)

At oral argument before this court, MUD argued that its motion in limine and that the court's order on the same did not actually preclude or exclude Chevalier or Meisinger from testifying to the substantive evidence of their claims and concerns regarding the application process; rather, MUD argued that the motion in limine only limited the jury from hearing that Chevalier and Meisinger had filed gender discrimination lawsuits against MUD. However, the above ruling of the trial court was clear that Chevalier and Meisinger's testimony "would be going towards observations . . . they have with regard to . . . Hartley" and "not . . . [to] any respective claims that they may have on behalf of themselves or other women." Further, throughout trial, MUD's evidentiary objections and the trial court's rulings on the same generally adhered to the trial court's initial ruling on the motion in limine as stated above, contrary to the explanation offered by MUD at oral argument. During Hartley's counsel's direct examination of Hartley, the court sustained MUD's relevance and foundation objections to her counsel's question, "And do you know, had Ms. Chevalier also put in for this same promotion you had?" During direct examination of Meisinger by Hartley's counsel, the court sustained MUD's relevance objection to Hartley's question about how Meisinger's interview with Henn went. Later on during Hartley's examination of Meisinger, the following exchange took place:

Q. Okay. When you saw the posting for the supervisor of field engineering position, did you see something unusual about it?

A. Yes.

Q. What was that?

A. The operator qualification and then ongoing locating preferred.

[Counsel for MUD]: Objection, relevance. Move to strike. And may we approach?

THE COURT: I'll overrule the objection, but you may approach.

[Conversation held outside presence of jury]

[Counsel for MUD]: Again, Judge, we had a motion in limine that you ruled on very clearly this morning. I believe [Counsel for Hartley] is deliberately going outside of the boundaries that you set for her, and I believe we are pretty close to a mistrial in this matter.

. . .

THE COURT: I have limited Ms. Meisinger to speak to what she may have observed with regard to Ms. Hartley, but not to bring in anything related to any claims or anything she may have with regard to the position.

MUD then moved for a mistrial, which the court overruled, but reversed its earlier ruling on MUD's objection, and sustained MUD's relevancy objection. Hartley made an offer of proof that Meisinger would have stated that she believed the operator qualification was added to preclude her from being qualified for that job. Hartley made another offer of proof during her cross-examination of Chevalier, stating:

- 10 -

I would like to introduce into evidence -- the Court doesn't want the fact that [Chevalier] had a performance evaluation performed on her right around the end part of February, early part of March of 2010 while she had an application pending for this job as well, and I know you don't want me to bring it up. So for an offer of proof, I would offer to say that she would say that she applied for this position. They also did an evaluation on her and -- had not done an evaluation since 2007 and did it during the time this application was pending.

In the instant case, the trial court's blanket evidentiary exclusion pursuant to MUD's motion in limine prevented Hartley from presenting relevant evidence that would have tended to show that MUD's decision not to promote Hartley was motivated by her gender rather than its proffered reasons. The experiences of the only other two women to apply for the position certainly would be relevant to show that MUD may have discriminated against Hartley based upon her gender. As stated above, blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives. *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir. 1988) *overruled on other grounds* by *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). Hartley faced the difficult task of persuading the fact-finder to disbelieve MUD's account of its own motives, and she had the ultimate burden of persuading the trier of fact that MUD intentionally discriminated against her; however, the trial court's ruling unfairly prejudiced her in her attempt to meet this burden. Accordingly, we reverse for a new trial, and on remand, Hartley must be afforded a fair opportunity to show that MUD's stated reasons for her rejection were in fact pretext for discrimination, and that includes admitting relevant evidence related to Chevalier and Meisinger's treatment and rejection from the same position at issue.

*Exclusion of Exhibits 49 and 84.*

Because the issue of the admissibility of exhibits 49 and 84 is likely to recur during the new trial, we will address this assignment of error. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *Nebraska Accountability & Disclosure Comm'n v. Skinner*, 288 Neb. 804, 853 N.W.2d 1 (2014).

Hartley argues the court erred in excluding exhibits 49 and 84, which are both documents related to Hartley's lateral move within MUD subsequent to the promotion at issue in the instant case. Hartley claims that the evidence "contradicted the Appellee's testimony regarding the reasons that [Hartley] was not selected for the position" and would have demonstrated to the jury that the articulated reason for not promoting Hartley was a pretext to discriminate against her on the basis of her gender. Brief for appellant at 22.

At trial, Hartley testified that she had made a lateral move within MUD and testified what her current position was within MUD. Exhibit 49 was Hartley's letter dated June 13, 2011, to MUD's human resources department applying for the lateral position, generally outlining her experience and interest in the position. The court sustained a relevancy objection to the admission of exhibit 49.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, and evidence which is not relevant is not admissible. See Neb. Rev. Stat. § 27-401 (Reissue 2008) and § 27-402 (Reissue 2008). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Sturzenegger v. Father Flanagan's Boy's Home*, 276 Neb. 327, 754 N.W.2d 406 (2008). We do not see how Hartley's letter applying for her current position in 2011, more than a year after the promotional decision at issue was made, would tend to make it more probable that there was gender discrimination in the promotional decision made by different individuals in early 2010, and conclude the trial court did not abuse its discretion in excluding exhibit 49 on the basis of relevance.

Exhibit 84, an undated document from MUD personnel made at some point after Hartley's lateral transfer was approved in 2011, was offered by Hartley during rebuttal, and excluded by the court on MUD's relevance, foundation, and outside rebuttal objections. The document, signed by a supervisor named "Jeff Loll," stated that Hartley "communicates well with contractors," she is "direct and professional," and she "functions independently without excessive reliance on others." Such statements do conflict with Henn and Velehradsky's testimony regarding their reasons for not promoting Hartley, namely, that she was "unprofessional," had "communication issues" and often needed "help" making decisions. However, this document was authored more than a year after the promotional decision at issue by an individual (apparently) in a different department and uninvolved in the events in dispute. We cannot say that the trial court abused its discretion in excluding this evidence on the basis of relevancy.

## CONCLUSION

We conclude the district court's blanket exclusion of evidence pursuant to MUD's motion in limine was an abuse of discretion, and as a result, Hartley was prevented a full and fair opportunity to present her case. We therefore reverse and remand for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.